**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION**

HUB INTERNATIONAL MIDWEST
LIMITED,

     Plaintiff,

v.

JUSTIN SORENSEN and ALLIANT
INSURANCE SERVICES, INC.,

     Defendants.

_____

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff HUB International Midwest Limited ("HUB") files this Verified Complaint for Injunctive Relief and Damages against Defendants Justin Sorensen ("Sorensen") and Alliant Insurance Services, Inc. ("Alliant") (collectively, "Defendants"), and alleges as follows:

## INTRODUCTION

This action involves a former HUB employee who breached valid and enforceable restrictive covenants he entered into with HUB, and the competitor that knowingly aided and abetted those breaches. On June 26, 2026, Sorensen resigned from HUB without notice and immediately joined Alliant, a direct competitor. Despite having signed a Confidentiality and Non-Solicitation Agreement ("Agreement") containing restrictive covenants that prohibit him from soliciting, servicing, or interfering with HUB Clients on behalf of a competitor for two years post-

employment, Sorensen and Alliant have engaged in a brazen campaign to divert HUB's Clients to Alliant.

On his last day at HUB, Sorensen disparaged HUB on a client call and informed the client that he was leaving for Alliant, where his team has "everything in place" the client would need to be served there.  In the weeks that followed, multiple HUB clients serviced by Sorensen during his employment submitted broker of record ("BOR") letters transferring their business from HUB to Alliant, including Flora & Fauna Flowershop, Inc. ("Flora & Fauna"), Clearview AI, Inc. ("Clearview AI"), and SFR3, LLC ("SFR3").  The timing and pattern of these BOR transfers, which occurred in rapid succession shortly after Sorensen's sudden departure to Alliant, make clear Sorensen has been actively soliciting, servicing, and interfering with HUB's client relationships in violation of his Agreement, and that Alliant has knowingly participated in and benefited from that misconduct.

Newly discovered email evidence conclusively establishes that Flora & Fauna transferred to Alliant specifically because of Sorensen, that Sorensen submitted the BOR on behalf of Alliant, and that Sorensen is actively servicing the account at Alliant. This evidence removes any doubt about Sorensen's conduct and confirms his violations of the non-solicitation, non-acceptance, and non-service provisions of his Agreement.

HUB seeks injunctive relief to enforce the terms of the Agreement and monetary damages for the clients lost as a direct result of Sorensen's breaches.

## PARTIES

1.      HUB is a leading insurance brokerage firm that provides an array of property, casualty, risk management, life and health, employee benefits, investment, and wealth management products and services throughout the United States.

2.      HUB is an Indiana corporation with its principal place of business located in Chicago, Illinois.

3.      Sorensen is a citizen of Florida who is domiciled and resides in Naples, Florida, at 14960 Collier Blvd #3026, Naples, Florida 34119.

4.      Alliant Insurance Services, Inc. is a corporation organized under the laws of the State of California with its principal place of business in California.  Alliant is a national insurance brokerage firm and a direct competitor of HUB.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity among the parties (HUB is an Indiana and Illinois citizen, Sorensen is a Florida citizen, and Alliant is a California citizen) and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

6.      This Court has personal jurisdiction over Sorensen because he is domiciled in and resides in Naples, Florida, which is within this judicial district.

7.      This Court has personal jurisdiction over Alliant because Alliant conducts business in this judicial district, has employed Sorensen to work in this

judicial district, and has committed tortious acts within this judicial district by knowingly inducing and facilitating Sorensen's breach of his Agreement with HUB.

8.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because Sorensen resides in this district and a substantial part of the events giving rise to the claims occurred in this district, including Sorensen's solicitation of and interference with HUB clients from his residence in Naples, Florida.

## EVENTS GIVING RISE TO THIS ACTION

### Sorensen's Employment with HUB

9.    HUB hired Sorensen in late February 2023.  He worked for HUB as a Senior Vice President and Producer, specializing in HUB's High-Growth Ventures ("HGV") practice.

10.    In this role, Sorensen was responsible for producing and servicing a substantial book of insurance brokerage business for HUB, consisting of approximately 188 client accounts generating approximately $1.6 million in annual revenue.

11.    In performing his duties, Sorensen accessed and used HUB's confidential and proprietary business and client information, including client contact information, insurance requirements and preferences, policy terms, premiums and expiration dates, renewal information, claims and loss history, and commission data.  Sorensen also developed substantial relationships with HUB's clients and their key personnel.

**The Confidentiality and Non-Solicitation Agreement**

12.     On or about December 27, 2022, as a condition of his employment with HUB, Sorensen entered into the Agreement, which became effective February 23, 2023.  A true and correct copy of the Agreement is attached hereto as **Exhibit 1**.

13.     Pursuant to the Agreement, Sorensen agreed, among other things, that both during his HUB employment and for two years after termination of his HUB employment, Sorensen:

> shall not, directly or indirectly, either for Employee's own benefit or on behalf of any other person or entity: (1) solicit any Client or Prospective Client for or on behalf of an existing or prospective Competitive Business; (2) except in connection with Employee's employment by the Company and for the benefit of the Hub Group, accept a broker or agent of record appointment for the placement of insurance for, place or broker insurance on behalf of, or provide insurance administrative functions or consulting services to, any Client or Prospective Client; or (3) interfere with or damage or attempt to interfere with or damage any member of the Hub Group's business relationship with any Client or Prospective Client.

(Ex. 1, § 5(b)).

14.     For purposes of the Agreement, "Client" is defined to mean:

> any person or entity who or which is, or at any time during the twelve (12) month period immediately preceding the date of termination of Employee's employment was, a client of the Company or any other member of the Hub Group (1) to whom Employee provided services or for whom Employee transacted business or (2) about whom Employee acquired information not generally available to the public as a result of or in connection with Employee's employment.

(Ex. 1, § 5(a)(i)).

15.     For purposes of the Agreement, "Prospective Client" is defined to mean:

> any person or entity other than a Client if, during the twelve (12) month period immediately preceding the date of termination of Employee's employment, (1) Employee submitted or assisted in the submission of a

proposal or quote of any kind on behalf of the Company or any other member of the Hub Group to such person or entity or (2) as a result of or in connection with Employee's employment, Employee acquired information about such person or entity not generally available to the public.

(Ex. 1, § 5(a)(iv)).

16.     For purposes of the Agreement, "Competitive Business" is defined to mean "any person or entity engaged in the business of providing retail or wholesale insurance brokerage services, conventional or alternative risk management products and services, employee benefits or human resources consulting services, managing general agent or underwriting services, or other insurance administrative functions or consulting services." (Ex. 1, § 5(a)(ii)).  Alliant is a Competitive Business within the meaning of the Agreement.

17.     Sorensen also agreed that, during his employment with HUB and at all times following the termination of his employment, he would not disclose or use Confidential Information of HUB, including information regarding clients and prospective clients, contact information, insurance requirements or preferences, insurance policy terms, renewal information, claims and loss history, and information pertaining to HUB's relationships with insurance carriers and providers of products or services.  (Ex. 1, § 3(a)–(b)).

18.     Sorensen further specifically acknowledged and agreed in the Agreement that HUB's Confidential Information "consists of trade secrets and other confidential or proprietary information as defined by the Uniform Trade Secrets Act and/or any

other applicable state statutes or regulations relating to trade secrets or confidential information." (Ex. 1, § 3(d)).

19.     By executing the Agreement, Sorensen acknowledged and agreed:

(1) the Company and the other members of the Hub Group are engaged in highly competitive businesses; (2) the covenants of this Section 5 are reasonable as to subject matter, geographic area and length of time and are necessary to protect the trade secrets, Confidential Information, substantial relationships and goodwill with Clients and Prospective Clients, and other legitimate business interests of the Company and other members of the Hub Group; (3) the covenants of this Section 5 will not interfere unreasonably with Employee's ability to earn a livelihood; (4) but for Employee's agreement to comply with the covenants of this Section 5, the Company would not have employed Employee; and (5) the existence of any claim or cause of action of Employee against the Company, whether based on this Agreement or otherwise, will not constitute a defense to the Company's enforcement of the covenants of this Section 5.

(Ex. 1, § 5(e)).

20.     With respect to remedies for breach, Sorensen acknowledged and agreed:

it would be extremely difficult, if not impossible, to calculate the precise amount of damages of the Hub Group in the event of Employee's breach of any provision of this Agreement; (2) Employee's breach of any provision of this Agreement would result in irreparable and ongoing damages to the Hub Group that may not be adequately compensated by monetary damages alone; and (3) the payment of liquidated damages pursuant to Section 6(a) shall in no way limit the other remedies to which the Company or other members of the Hub Group may be entitled as a result of Employee's breach of this Agreement.  Accordingly, Employee agrees that in the event of any actual or threatened breach of any provision of this Agreement, the Company and the other members of the Hub Group will be entitled, in addition to all other rights and remedies existing in their favor at law, in equity or otherwise (including the liquidated damages contemplated by Section 6(a)), to obtain injunctive or other equitable relief (including a temporary restraining order) against Employee to prevent any actual or threatened breach of this Agreement and to enforce this Agreement specifically, without the necessity of posting a bond or other security or of proving actual damages.

(Ex. 1, § 6(b)).

21.     The Agreement specifically provides for liquidated damages payable to HUB in the event of a breach of Section 5(b):

> Employee shall pay to the Company as liquidated damages, and not as a penalty, an amount equal to two (2) times the Lost Revenues (as defined below) lost as a direct or indirect result of such prohibited activity. Employee acknowledges and agrees that such amount is a reasonable calculation of the Company's liquidated damages and not a penalty having regard to the standards of the insurance brokerage industry and given the interest of the Company in maintaining its client base and the future profits that would be foregone by the Company if Employee violates any provision of Section 5(b). "Lost Revenues" means the gross commissions and fees generated by or attributable to any Client or Prospective Client during the twelve-month period ending on the date on which Employee first acted in violation of this Agreement or, if higher, the gross commissions and fees the Company reasonably anticipated generating, in the absence of Employee's violation of this Agreement, during the twelve-month period beginning on the date on which Employee first acted in violation of this Agreement.

(Ex. 1, § 6(a)(i)).

22.     The Agreement further provides that the prevailing party in any action to enforce the Agreement is entitled to all costs and expenses, including reasonable attorneys' fees. (Ex. 1, § 10(c)).

23.     The Agreement also contains a tolling provision that extends the restrictive periods by the length of any period during which Sorensen is in breach of any covenant of Section 5. (Ex. 1, § 5(d)).

24.     The Agreement requires that prior to accepting employment with any third party engaged in a Competitive Business, Sorensen "will provide such third party

with written notice of such covenants, with a copy of such notice delivered simultaneously to the President of the Company." (Ex. 1, § 5(d)).

### Sorensen's Abrupt Resignation and Departure to Alliant

25.     On June 26, 2026, Sorensen submitted his resignation from HUB via email, effective immediately that same day.  He gave no advance notice of his departure and provided no transition or handoff of his active client work to the HGV service team.

26.     Sorensen's resignation letter was sent to HUB's President & CEO, Anthony Palumbo, Chief Sales Officer Andrew Burns, and Executive Vice President Robert Benvenuto.  In his letter, Sorensen stated he was resigning from his position as Senior Vice President and Producer at HUB International, effective that same day, June 26, 2026.

27.     On or about June 26, 2026, Sorensen joined Alliant, a Competitive Business and a direct competitor of HUB.

### Sorensen's Misconduct on His Last Day at HUB

28.     On June 26, 2026, his last day at HUB, Sorensen was adamant about participating in a client call with HUB client SCP Electrical Holdings ("SCP").  During that call, Sorensen told the client that HUB has "no diligence team in place" and is going to have "trouble supporting" them.  In doing so, Sorensen overtly disparaged HUB's capabilities.  After disparaging HUB during the call, Sorensen specifically informed the client that he was joining Alliant where the Alliant team has "everything in place" SCP would need for insurance brokerage services.

29.     Following Sorensen's statements, SCP contacted others and HUB and expressed concern about HUB's transition plan and asked detailed questions about HUB's team and deliverables going forward.

30.     Also on June 26, 2026, Sorensen called HUB's HGV service team into a meeting, told them he was leaving HUB, and then left.  He specifically told service team members he was working on quotes for clients that no one else has dealt with or has seen.  This, of course, forced HUB to start the quote processes all over with these clients.  His departure was abrupt, unprofessional, and left the service team without any transition or handoff of his active client work.

31.     On the same day, Sorensen emailed the London broker who was working on a CLIP (Combined Liability Insurance Policy) submission for HUB Client Flora & Fauna to inform the broker that it was Sorensen's last day at HUB.  This direct communication by a producer to a carrier about his departure was not typical HUB practice and served no legitimate business purpose.

32.     Prior to his resignation, Sorensen had been actively working on placing the CLIP policy for Flora & Fauna, which represented more than $100,000 annually in premium.  He told HUB account manager Ging Stecki ("Stecki") that he was handling the CLIP submission.  However, on June 26, 2026, when Stecki followed up with Sorensen on the status of the CLIP placement, Sorensen advised Stecki to focus on the renewal instead because Sorensen did not think the carrier would write it, despite the fact that client Flora & Fauna remained interested in the policy.

33.    Email evidence also establishes that Sorensen solicited and interfered with at least one Prospective Client while still employed at HUB. On June 22, 2026, just four days before his resignation, Sorensen received an email from Justin Abel ("Abel"), the Chief Operating Officer of Tesouro, seeking insurance services related to its upcoming July 1, 2026, renewal. Sorensen responded and held a phone call with Abel, after which Abel sent an email thanking Sorensen for his time and stating: "congratulations on the pending move to the new firm." This establishes that Sorensen had already disclosed his planned departure to a prospective client.

34.    At the time of these communications, Sorensen was soliciting Tesouro's insurance business using his HUB email address and HUB title of Practice Leader, High Growth Ventures, while simultaneously directing the prospective client's future business to himself at his new employer. A true and correct copy of the Tesouro email correspondence is attached hereto as **Exhibit 2**.

35.    Tesouro is a "Prospective Client" within the meaning of Section 5(a)(iv) of the Agreement because during the twelve months preceding the termination of Sorensen's employment, Sorensen submitted or assisted in the submission of proposals and quotes on behalf of HUB to Tesouro. Sorensen had been working on Tesouro as a prospective client for HUB since at least April 2026, including the marketing proposal outlined in his June 22, 2026, communications.

**Sorensen's Post-Employment Solicitation and Interference**

36. Within days of Sorensen's departure, HUB began receiving BOR letters from its clients that had been serviced by Sorensen during his employment, transferring their insurance business from HUB to Alliant.

37. On or about July 1, 2026, Flora & Fauna submitted a BOR letter to the London market, transferring the BOR appointment for the CLIP policy from HUB to Alliant. A true and correct copy of the Flora & Fauna BOR letter is attached hereto as **Exhibit 3**. HUB account manager Stecki learned of this BOR on July 7, 2026, when the London broker informed her that he had received a BOR to Alliant dated July 1, 2026.

38. Flora & Fauna first became a HUB client on or about July 21, 2025, and Sorensen serviced Flora & Fauna as its HUB producer.

39. On or about July 14, 2026, HUB received notice that the balance of the Flora & Fauna account was also being BOR'd to Alliant. The carrier, Tokio Marine HCC, notified HUB that it received a BOR letter on July 13, 2026, identifying another broker of record for Flora & Fauna's Tech E&O/Cyber policy. A true and correct copy of the additional Flora & Fauna BOR letters are attached hereto as **Exhibit 4**.

40. From July 10 to 14, 2026, HUB received multiple BOR letters from carriers notifying HUB that Clearview AI, Inc. ("Clearview AI"), another HUB client for whom Sorensen was the producer at HUB, transferred multiple lines of insurance from HUB to Alliant, including its D&O policy, Tech E&O policy, and Business

Owners Policy.  Clearview AI had just become a client of HUB in May 2026.  A true and correct copy of the Clearview AI BOR letters are attached hereto as **Exhibit 5**.

41.     On August 4, 2026, SFR3, Sorensen's largest client at HUB generating approximately $573,000 in annual revenue, notified HUB that it had decided to transfer its insurance brokerage relationship from HUB to Alliant.  In an email to HUB, SFR3's David Isaacs expressly stated that the decision was "not a reflection of the team" and acknowledged that "its property program has been a shining star since [SFR3] moved to HUB," suggesting the transfer was not service-related but rather the result of other forces—namely, Sorensen's interference on behalf of Alliant.  A true and correct copy of the correspondence from SFR3 to HUB is attached as **Exhibit 6**.

42.     Flora & Fauna, Clearview AI, and SFR3 are "Clients" within the meaning of Section 5(a)(i) of the Agreement because each was a client of HUB to whom Sorensen provided services or for whom Sorensen transacted business during the twelve months preceding the termination of his employment.

43.     In addition to the BORs received from Flora & Fauna, Clearview AI, and SFR3, HUB identified indicators that another former Sorensen account, Bio Principia, may be next, as five years of loss runs were requested for that account, which is a common precursor to a change of broker.

44.     HUB's book of business formerly managed by Sorensen, consisting of approximately $1.6 million in annual revenue, remains under active pressure from Sorensen and Alliant, and HUB reasonably anticipates that Sorensen and Alliant will continue their campaign to divert HUB clients absent court intervention.

45. The rapid and systematic pattern of BOR transfers from HUB to Alliant involving multiple clients previously served at HUB by Sorensen commencing almost immediately after his departure demonstrates Sorensen has been actively soliciting, servicing, and/or interfering with HUB's client relationships on behalf of Alliant in direct violation of Section 5(b) of the Agreement.  It is highly implausible that multiple clients would independently and simultaneously transfer their business from HUB to the competitor that just hired Sorensen absent solicitation, interference, or both. Sorensen's departure appears to have been planned for some time, as evidenced by his statement on his last day that he already had his "team" and "everything in place." with Alliant.

46. Indeed, the Flora & Fauna CLIP BOR is particularly telling: Sorensen was actively working on placing the CLIP policy for Flora & Fauna while employed at HUB, emailed the London broker on his last day to inform the broker it was his last day, and then within five days, the client submitted a BOR letter transferring the BOR for that policy line to Alliant.

47. On June 30, 2026, just four days after Sorensen's resignation, Flora & Fauna's Head of Operations, Carson Lee, sent an email to Sorensen (now at Alliant), Alliant employee Amy Page, and Flora & Fauna's outside counsel at Fenwick & West stating: "Justin has left HUB and moved to Alliant.  We will move over to Alliant so there is no disruption with Justin's current negotiations/discussions with Armilla, the carrier for the policy." The email further outlined "next steps" including:

"Justin/Alliant to send over the BOR (Broker of Record) ASAP to officially transfer this over." Email correspondence with Flora & Fauna is attached as **Exhibit 7**.

48.    On July 2, 2026, Flora & Fauna's Head of Operations sent a follow-up email confirming: "Closing the loop here: BOR is signed to transition this process to Alliant." The email then asked Sorensen directly: "are you now able to proceed with the discussions with Armilla?"

49.    On July 7, 2026, Flora & Fauna's Co-Founder, Alex Li, emailed Sorensen at his Alliant email address (justin.sorensen@alliant.com), stating: "Following up here @justin.sorensen, this is currently blocking a deal if you could advise." This email was found in Sorensen's HUB inbox addressed to both his Alliant and HUB email addresses. This evidence conclusively establishes that: (1) Flora & Fauna moved to Alliant specifically because of Sorensen and to continue working with him; (2) Sorensen submitted BOR letters on behalf of Alliant to transfer the Flora & Fauna business from HUB; and (3) Sorensen is actively servicing the Flora & Fauna account at Alliant, including negotiating with insurance carriers and advising on client deals in direct violation of the non-solicitation, non-acceptance, and non-service provisions of his Agreement.

### HUB's Cease and Desist and Alliant's Response

50.    On June 30, 2026, HUB sent Sorensen a letter reminding him of his continuing obligations under the Agreement and advising him that HUB had evidence that he was actively violating the terms of the Agreement (the "Continuing Obligations

Letter"). A true and correct copy of the Continuing Obligations Letter is attached hereto as **Exhibit 8**.

51. The letter specifically referenced the SCP incident and warned Sorensen that his conduct would expose him and potentially Alliant to liability for breach of contract, tortious interference, and other claims.

52. On July 10, 2026, counsel for Sorensen and Alliant responded to HUB's Continuing Obligations Letter (the "Response Letter"). A true and correct copy of the Response Letter is attached hereto as **Exhibit 9**. The Response Letter confirmed counsel represents both Sorensen and Alliant, demonstrating Alliant's direct involvement in and knowledge of the dispute over Sorensen's restrictive covenants.

53. In the response, counsel denied Sorensen had solicited SCP and asserted that Sorensen "is abiding by his post-employment restrictions." However, the subsequent BOR transfers of Flora & Fauna, Clearview AI, and SFR3 to Alliant directly contradict this assertion and demonstrate that Sorensen's solicitation and interference activities have continued unabated.

54. Notably, counsel's response did not address Sorensen's contact with the London broker regarding the Flora & Fauna CLIP policy or any of the other client solicitation activities that had already resulted in BOR transfers to Alliant. The email evidence subsequently obtained by HUB showing Flora & Fauna moved to Alliant specifically to continue working with Sorensen and that Sorensen submitted the BOR on behalf of Alliant and is actively servicing the account removes any doubt about Sorensen's conduct.

**Alliant's Knowledge of and Participation in Sorensen's Breaches**

55.    At all times relevant to this Complaint, Alliant knew or should have known of Sorensen's Agreement with HUB and the restrictive covenants contained therein.  The Agreement requires Sorensen to provide written notice of his restrictive covenants to any third party engaged in a Competitive Business before accepting employment.  (Ex. 1, § 5(d)).

56.    Alliant's knowledge of the Agreement is further confirmed by the fact that Alliant retained counsel to respond jointly to HUB's cease and desist letter on behalf of both Alliant and Sorensen in response to HUB's June 30, 2026 letter.

57.    Despite its knowledge of the Agreement, Alliant hired Sorensen, facilitated his solicitation of HUB clients, and accepted the business diverted from HUB as a result of Sorensen's breaches.

58.    Alliant knowingly aided, assisted, and encouraged Sorensen in soliciting, servicing, and interfering with HUB's clients in violation of the Agreement.  Alliant accepted BOR appointments from HUB clients for Sorensen to be their producer that it knew or should have known were protected under the Agreement and were being improperly solicited by Sorensen.

59.    Alliant has engaged in a pattern and practice of recruiting employees of its competitors who are bound by restrictive covenants and facilitating those employees' breaches of their contractual obligations to their former employers.  Alliant has been sued on multiple occasions by competing insurance brokerages for tortious interference with restrictive covenant agreements and for aiding former employees in

soliciting and diverting their former employers' clients.  This pattern demonstrates that Alliant's conduct with respect to Sorensen is not an isolated incident but rather reflects Alliant's knowing and deliberate business strategy of inducing breaches of competitors' restrictive covenants to acquire their client relationships.

60.     HUB has retained undersigned counsel to enforce its rights pursuant to the Agreement and is obligated to pay reasonable attorneys' fees for counsel's services.

## COUNT I: BREACH OF CONTRACT
### (Against Sorensen)

61.     HUB hereby incorporates by reference the allegations in paragraphs 1 through 60 above as though fully set forth herein.

62.     The Agreement attached as Exhibit 1 is an enforceable contract.

63.     The restrictive covenants in the Agreement are reasonable, valid, and tailored to reasonably protect HUB's legitimate business interests, including its confidential business information and its valuable client relationships.

64.     The provisions of the Agreement are designed to protect the significant investments HUB has made in its business operations, training, marketing and business development efforts, and in its substantial client relationships.

65.     HUB performed all material obligations required of it under the Agreement.

66.     Sorensen has breached the Agreement by, among other things:

a. Directly or indirectly soliciting HUB Clients, including Flora & Fauna, Clearview AI, and SFR3, for or on behalf of Alliant, a Competitive Business, in violation of Section 5(b)(1) of the Agreement;

b. Directly or indirectly accepting or facilitating BOR appointments for the placement of insurance for, or providing insurance administrative functions or consulting services to, HUB Clients, including Flora & Fauna, Clearview AI, and SFR3, on behalf of Alliant, in violation of Section 5(b)(2) of the Agreement; and

c. Interfering with or damaging, or attempting to interfere with or damage, HUB's business relationships with its Clients, including Flora & Fauna, Clearview AI, SFR3, and SCP, in violation of Section 5(b)(3) of the Agreement.

67. HUB has suffered damages as a direct and proximate result of Sorensen's breaches, including, without limitation, the loss of client relationships, business revenues, market share, profits, and goodwill.

68. HUB is entitled to liquidated damages as set forth in Section 6(a) of the Agreement, including an amount equal to two times the Lost Revenues lost as a direct or indirect result of Sorensen's prohibited activity.

69. HUB is further entitled to injunctive relief as set forth in Section 6(b) of the Agreement, including an extension of the restrictive periods for any period of time during which Sorensen has been in breach of any covenant in Section 5 of the Agreement.

## COUNT II: TORTIOUS INTERFERENCE WITH CONTRACTUAL OR BUSINESS RELATIONSHIPS
### *(Against Alliant)*

70. HUB hereby incorporates by reference the allegations in paragraphs 1 through 60 above as though fully set forth herein.

71. At all times relevant to this Complaint, there existed a valid and enforceable contract between HUB and Sorensen, namely the Agreement, which contains restrictive covenants prohibiting Sorensen from soliciting, servicing, or interfering with certain HUB's clients on behalf of a Competitive Business for two years following termination of his employment.

72. Alliant knew of the existence of the Agreement and its restrictive covenants. This knowledge is evidenced by, among other things: (a) Alliant's retention of counsel to respond jointly on behalf of both Alliant and Sorensen to HUB's June 30, 2026, cease and desist letter; (b) the Agreement's requirement that Sorensen provide any new employer engaged in a Competitive Business with written notice of his restrictive covenants prior to accepting employment; and (c) the Agreement's grant to HUB of the right to notify any such third party of Sorensen's obligations.

73. Despite its knowledge of the Agreement, Alliant intentionally and unjustifiably interfered with the Agreement by:

a. Hiring Sorensen and employing him in a position that would necessarily involve him in soliciting, servicing, and interfering with protected HUB "Clients" in violation of the Agreement;

b. Encouraging, facilitating, and/or directing Sorensen to solicit protected HUB Clients to transfer their business to Alliant; and

c. Accepting BOR appointments from protected HUB Clients, including Flora & Fauna, Clearview AI, and SFR3, that Alliant knew or should have known were being solicited in violation of the Agreement and/or permitting Sorensen to provide consulting services to protected HUB Clients as their producer at Alliant.

74.    As a direct and proximate result of Alliant's tortious interference, HUB has suffered damages, including the loss of client relationships, business revenues, market share, profits, and goodwill.

75.    Alliant's interference was intentional, willful, and without justification.

## PRAYER FOR RELIEF

WHEREFORE, HUB prays for the Court to enter orders or judgment providing for the following:

A. For a preliminary injunction and permanent injunction prohibiting Sorensen, and all persons acting in concert or participation with him, from breaching Sections 3 and 5 of the Agreement, including but not limited to prohibiting Sorensen from soliciting, servicing, or interfering with any HUB Client or Prospective Client on behalf of Alliant or any other Competitive Business (and extending the length of the injunction for periods of breach as provided for in Section 5(d) of the Agreement);

B.  For a preliminary injunction and permanent injunction prohibiting Alliant, and all persons acting in concert or participation with it, from aiding, abetting, encouraging, or facilitating Sorensen's breach of the Agreement, and from accepting any BOR appointments or business from HUB Clients or Prospective Clients obtained through Sorensen's solicitation or interference in violation of the Agreement;

C.  For monetary damages for breach of contract, including liquidated damages as provided under Section 6(a) of the Agreement, in an amount equal to two times the Lost Revenues lost as a direct or indirect result of Sorensen's breach of Section 5(b);

D.  For compensatory damages against Alliant for tortious interference with the Agreement;

E.  For prejudgment and post-judgment interest at the rate authorized by law;

F.  For attorneys' fees and costs incurred herein as permitted under the Agreement; and

G.  For such other relief as the Court deems just and proper.

Dated: August 11, 2026

Respectfully submitted,


*/s/ Raquel R. Jefferson*
Dennis M. McClelland
  Florida Bar No. 0091758
Raquel Ramirez Jefferson
  Florida Bar No. 103758
Matthew Scott Perez
  Florida Bar No. 125572
PHELPS DUNBAR LLP
100 South Ashley Drive, Suite 2000
Tampa, Florida  33602-5315
Telephone:  (813) 472-7550
Facsimile:  (813) 472-7570
dennis.mcclelland@phelps.com
raquel.jefferson@phelps.com
matthew.perez@phelps.com

*Attorneys for Plaintiff HUB International Midwest, Ltd.*

Docusign Envelope ID: B14C7C98-6E9B-8905-833E-9D9FE435A433

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, under penalties of perjury, I, Anthony Palumbo, President & CEO of HUB International Limited Midwest West, declare that I have read the foregoing document and that the facts stated in it are true and accurate to the best of my personal knowledge, information, and belief, and records and information available to HUB International Midwest Limited.

I further declare that Exhibits 1 through 8 attached to the foregoing document are true and correct copies of records made at or near the time of the events reflected therein by persons with knowledge; that the records were kept in the ordinary course of HUB's regularly conducted business activities; and that it was HUB's regular practice to make and maintain such records.

Executed on August 10, 2026.

DocuSigned by:

*Anthony Palumbo*

99E623E0DB8142D...

_____

Anthony Palumbo
President & CEO
HUB International Limited Midwest West